Good morning, your honors. May it please the court, my name is Dwight Schulte, and I represent the appellant in this matter, Benjamin Brooks. Mr. Brooks is an African American that was traveling on Highway 191 near Bozeman, Montana. He was returning to his home in Billings, Montana, which is several hours away. He was pulled over for a routine traffic stop, an illegal pass. Highway 191 is a fairly narrow highway. He turned left off the highway and then took an immediate right into what was then becoming a business subdivision. At this point, Trooper Paul Moore determined that something was amiss based on where Mr. Brooks pulled off the highway. And from that point forward, he had concerns of criminal activity and began a joint criminal investigation and traffic stop. Well, let's, because you have limited time, and I know we're familiar with the facts, it seems to me the central issue in this case is this. The district judge found that the stop had been prolonged past the amount of time necessary to do the traffic processing. And so this case presents the question that I think the Evans case left open in footnote eight, which is, were there enough other reasons to detain your client for what I think was about 22 minutes before the officer told him, 23 minutes that he was free to go? And so could you address why you think there weren't other reasons that justified prolonging the detention? Of course, Your Honor. Other than, because you don't challenge his ability to stop him for the traffic violation here. That's correct, Your Honor. So, so first, with that, that line of questioning is, when do we evaluate whether independent reasonable suspicion existed? And it's our argument that we evaluate that at the time that the exit order was given for Mr. Brooks to leave the car. Okay. So let's, I want to run through it. I think he knew at that point. Certainly. The officer says early on, I was told by whoever I called that this was a dangerous offender. I'd stopped a dangerous offender. That may not be accurate information, but he says that's what he was told. He did not know that at the time of the exit order. He says he learned that he brought him into the car and he learned that shortly after bringing him into the car. That's correct. Once he'd given the exit order, had frisked Mr. Brooks and brought him into his vehicle, he did get information which was useful. Okay. Now, I'm talking about the period of detention. You're saying he must know before he, he must have all this information at the time he tells him to get out of his car? Correct, Your Honor. What case do you cite for that proposition? Your Honor, I think that Gorman gives us some, some foresight there into how to deal with this. It's the impetus that caused this chain of events. Well, but here's my difficulty with that, so help me. You make a traffic stop, it's an okay traffic stop. You're entitled to call in with the guy's license and find out. You call in with the guy's license and they say, oh my God, you've just picked up Dormer. That's a real killer. You're saying you can't take that into account because you didn't know it at the time you told him to get out of the car? Your Honor, the, the way that, that I believe we should view this is that when, when he took him out of the car, that's when the delay and the stop. But so you're saying, yes. The answer to my question is that if you then call in and find out that you've, that you've fortuitously stopped for a traffic violation, a wanted criminal, you may not keep him longer because you didn't know that when he told him to leave the car? Well, I, I think that at that point we're evaluating independent reasonable suspicion at two separate points in time. Well, so here, here's the difficulty, it seems to me. He has the ability to detain him at least as long to do the routine traffic processing, correct? That's correct, Your Honor. As he's doing the routine traffic processing, which he prolongs to be sure, at a very early point in that processing, he learns that he's got a dangerous offender here. It may not be accurate, but he's told that. We're not looking for probable cause. We're just talking about suspicion. So when you add that to the mix of what he already knows, it's a rental car. There's a bullet on the seat. My guess is there's bullets on every seat in Montana, but I don't know that we can take judicial notice of that. And then, and, and then when he asks him sort of the routine questions, they don't match up. Does all that, and then at some point along the way, put aside the Miranda issue, your client says, yes, I'm a convicted felon. When you add all those things up, again, putting aside Miranda, don't they give enough reasonable suspicion to prolong the investigation? Your Honor, I, I think that there's an argument they do not, but I think what's important here is when that determination is made. Right. And that's why I was asking you. So your point is that you have to make that determination when you tell the person to exit the car. Well, I, I think that's when the mission. Because if there is a reasonable argument that the other stuff comes in, it hurts you. So your point is that it has to be made at the time he exits the car. Under these circumstances, yes. But in Gorman, I'm trying to see here, I'm looking at Gorman right now. What, what, what are you pointing to in Gorman? So in, in Gorman, there were two stops, Your Honor. The first stop, which was found to be unreasonably delayed and was conceded to by the government, but the court found that that was the impetus, that first stop that under the exclusionary rule tainted the second stop, which then led to a drug sniff. And so how I, I read Gorman is that the, when the exit order was given, that is the impetus that started this delay. And what's very important, I think, with that exit order is that before Trooper Moore even addressed Mr. Brooks, he did not frisk Mr. Brooks. Brooks. The first thing he did when he got him out was search the car, a visual, a visual search of the car. I'd say, I, I, just for a moment, if you could just, I'm not sure I agree with you on Gorman and that your interpretation. So let's just look at what we have here. If that's not the case, it seems like we need to look at whether or not there's sufficient facts to establish reasonable suspicion here. And so there was a shell casing on the driver's side of Brooks' car. Brooks pulled off the highway further than what was normally, would have been expected by the officer. According to the officer, Brooks was making odd movements as Trooper Moore approached. Brooks refused to roll down the window, I guess, initially, and then he had to keep telling him. And then Brooks' story had some inconsistencies. Why, why isn't that enough? Well, let's just, without your Gorman theory, why isn't that enough? Well, Your Honor, a lot of that is very subjective on the officer. The officer's testimony was the biggest reason that he felt something was amiss was Mr. Brooks' behavior itself. And Judge Christensen rejects that. Or Judge Widnall, I'm sorry. It was Judge Christensen, Your Honor. Judge Christensen rejects that. He says, I don't, I don't find that supports suspicion because it's quite subjective. That's correct. But he does point to the, some of the other things Judge McGeer talks about. He says when you add them up cumulatively, they do. So why don't they? So he pointed to the brake lights remaining on. However, the brake lights were off by the time Trooper Moore exited his vehicle. Yeah, but I didn't mention the brake lights here. Okay. So let's just take that out. I'm looking at the things that I think are valid. I don't, you know, I'm not talking about whether he looked at them funny or didn't look at him funny. That's not the items that I focus on, but I'm looking at these items here. And why isn't that enough? Your Honor, well, the, I think that one major issue here is the gross movements. The video doesn't show them. You can see Mr. Brooks raise and lower his hands. You don't see these gross movements that Trooper Moore uses as additional basis for his, his hunch. Well, it's hard to see anything though, from the video on that part, from that far away, I mean, do you see anything at all? Do you see his outline at all in the video? I saw it. I just, hard to make out. You can, Your Honor. You can see Mr. Brooks raise and lower his hands. You can see his head. If he's moving, if he's twisting, if he's going into the back seat, it would be visible. But again, I think I want to be, I keep asking you the same question because it's important to me. Shortly after Mr. Brooks gets into the patrol car, the officer learns that he has, he stopped a very dangerous offender. I have no idea what that means. I have no idea whether it's accurate or not, but he's told that. If that counts, surely that, and he now knows he's seen a bullet in the car. Surely that gives him enough suspicion to continue the investigation past the traffic issue, does it not? It makes my argument a lot harder, Your Honor, if that's when we evaluate. So your, so your argument has to be that we can't, we can't, our evaluation stops at the moment that he exits the car. That's when the, the, the mission of the traffic stop ended. And at some point we do have to pick a bright line of saying. Well, no, the mission of the traffic stop, our cases say, ends after you've done the routine investigation that one does have to stop and someone you call back with a license and registration and, and whoever you call, I have no idea who you call, but you call someone and they say, yes, that may, or they say that's an expired license or we have no such person or something like that, but you're entitled to do, entitled to detain the person long enough to do that check. You agree? You are, Your Honor. So it doesn't end when he exits the car. It ends when you finish that check. Well, that's where we have an unrelated investigation that's prolonging the stop, the traffic mission. So my question is why isn't that unrelated investigation justified in light of the fact that the officer learns as he's doing the, what he can do, we all agree he can do, that your client is a violent offender. I, so I think, Your Honor, that Rodriguez says that you can't, um, use a traffic stop to conduct an unrelated investigation. And Rodriguez says you can't extend the traffic stop to do an unrelated investigation. Correct, Your Honor. But here, the information comes at the very beginning of what I think we both agree is the, the okay part of the traffic stop, checking out the person. So why doesn't that justify the extension? I, I think that once you're in the car, you have a different set of facts, but once you take somebody out of the car, it's an investigative technique, especially because he made a search and it, it was the officer's testimony that that does in fact prolong the stop. So we have the stop being prolonged at that point, and we need to evaluate the information on if he was able to at that point. But the officer's testimony was that he always takes someone he's detained for a traffic stop back to his car, correct? That is correct, Your Honor. And, and the district court credited that, right? That that was just part of the detention. So why here does it, is it anything other than that? Well, the trooper Moore testified that it can be an investigative technique. And the way I look at that, Your Honor, is if he regularly does that, he regularly prolongs a traffic stop. How is it prolonged? Uh, when you take someone out of the vehicle, it adds time to the stop and trooper Moore testified that it can be an investigative technique. Did you want to reserve the balance of your time? Yes, Your Honor. All right. I don't know if you have any more. I'll maybe give you a minute or two. Thank you, Your Honor. Good morning, and may it please the court. My name is Cassidy Adams and I represent the United States from the district of Montana. I'd like to start off by talking about reasonable suspicion as well, and continuing the conversation the court just had, um, we're asking the court to affirm the district court's order, denying the defendant's motion to suppress. Um, specifically regarding reasonable suspicion at the trial level, Judge Christensen noted a number of factors that ultimately led up to finding reasonable suspicion. Um, he didn't just take one factor individually. I'm looking at excerpt of the record pages 22 through 23. Um, it's very insightful. First of all, from the very beginning of the traffic stop, um, the defendant pulled off the highway, took a left into a newly developed subdivision and took an immediate right and continue driving down the road, parking alongside a dirt berm. Why does that give rise to suspicion of anything except a traffic violation? At that time, the trooper did not have reasonable suspicion. Okay. So, so all the things that occurred before he stopped him are essentially irrelevant to reasonable suspicion of a crime other than the traffic violation. Do you agree? Um, not entirely, Your Honor. So reasonable suspicion is a culmination of factors. I understand, but if, well, all you're repeating are facts that made it reasonable to stop him for the traffic violation. Uh, what happened after that? And Judge Christ, Judge Christensen holds, and I think we have to give deference to that, that the officer unduly prolonged, uh, the traffic stop and turned it into an investigative stop. So what facts occurred after the traffic stop that gave the officer the kind of reasonable suspicion that might allow him to prolong it? Well, going forward, after the trooper pulled over the defendant, um, he testified about the nature of the location of where the defendant pulled over and how that is not normally how people pull over. Um, immediately thereafter, um, the trooper, um, exited the vehicle, um, and testified that he saw gross furtive movements. Which Judge Christensen says, I do not find to be supportive of reasonable suspicion because they're entirely subjective, and I think we have to credit that finding by the district judge. So what else happens? Um, thereafter the trooper, um, had to ask the defendant to roll his window down. And in viewing the video, the trooper asked the defendant six times to roll his window down. Um, and the defendant did not fully comply, um, with that request, um, until after the sixth time. And that's very important for officer safety concerns. So at this point, um, the situation, um, and the reasonable suspicion is building. Well, so let me, let me ask the question differently. So you don't have to walk through the one hour tape second by second. At the time that he took him out of the car, did he have reasonable suspicion to conduct an investigation of any other crime other than the traffic violation? Uh, at that point he did not. It wasn't until he saw... So what happened later that, in your view, that gave him that reasonable suspicion? So what happened, um, was that as soon as the defendant was removed from the car, which the troopers allowed to do as part of a traffic stop, he doesn't have to have reasonable suspicion to do that pursuant to Maryland versus Wilson. As soon as the defendant's asked to get out of the car, the trooper briefly looks in to ensure there's no firearm in the vehicle, um, and at that point he sees ammunition. Um, before that, the defendant had twice denied having a weapon, um, which is inconsistent with the ammunition in the vehicle. Um, and the defendant's story that he had been attending a wedding. At that point, the trooper did have reasonable suspicion. There was more going on here. There's no reason for ammunition to be in a rental vehicle. If he had a firearm in the car and hadn't denied having one, it's Montana. Uh, lots of people have firearms in their cars. If he had a Uzi in the car, an M16, would you have reasonable suspicion then to think that a crime had occurred, assuming that he hadn't denied having one? It, reasonable suspicion is a very, uh. Well, the Supreme Court tells us we're all entitled to towed guns anywhere we want to. Uh, and in Montana, you seem to believe that. Um, if there were a gun in the car, would that give rise to reasonable suspicion? It would not. Um, so why does a bullet give rise to reasonable suspicion? I understand because he said, I have no, I have no firearms on me. It makes it inconsistent. But why does it give rise to reasonable suspicion of anything? It was the bullet combined with the other factors that the trooper had already observed. And also the fact that the defendant was not honest. Um, at that point, there is what the trooper thought was a spent shell casing later learned to be a bullet. Um, the defendant twice denied, said, I don't have any weapons. Um, and then the trooper got him out again. Pat's got him out of the vehicle. Pat searched him and asked him again, do you have any weapons? And a third time, the defendant denied having any weapons. So what does the fact that he has a bullet, make it clear that he lied about having a weapon? The logical inference that one can make from seeing ammunition in a vehicle, um, is that it's used to shoot something unless it's some kind of collector's item. But as the defendant told the trooper at the very initiation of a traffic stop, um, this was a rental vehicle. It was not his own vehicle. And the trial court even noted that too, um, and distinguished this in, um, a conversation that it had with counsel at the motion hearing that there's might be a difference between someone's old pickup truck that it goes out to the shooting range or goes hunting with in Montana, that distinction versus a short-term rental car that's only been rented a few days prior, um, someone denying have any weapons in the vehicle. Um, someone coming in from out of state, um, combined with the other factors that the trooper saw and the defendant appeared to be shielding appeared to be making gross movements and also was very reluctant to roll down his window and had to be asked six times. Well, I guess that's what I want to focus on for a little bit here. Um, because there's some factors that seem, um, relevant, appropriate to that, the, that the officer relied on. And then there's some reasons for suspicion that seem to be innocuous. Um, and that could apply to anyone. Um, for example, um, and you've mentioned a couple of them, um, trooper Moore thought it was suspicious that he was driving a rental car and he'd said he'd gone for a wedding. That doesn't seem that suspicious that someone would rent a car to go to a wedding, but Brooks didn't have luggage in the car. I don't know how he would know that by not looking at the trunk. Um, but even if he didn't have luggage in the car and then Brooks was on a highway that is used for drug trafficking, well, there's a lot of people who are on that highway, um, aside from people who are using that, probably more than the people that aren't using it for drug trafficking, he had a map, a shirt and toilet paper in the car. That also seems somewhat innocuous. Uh, and then his car looked, lived in. Uh, I'm just trying to figure out how these constitute particularized, uh, and objective facts suggesting criminal activity, and I'm trying to parse out which ones are not, you know, are appropriate, uh, of the factors. Those to me seems like ones that are, are more innocuous. Can you respond to that? I think the court needs to consider all the factors in their entirety. Um, but judge Christensen and his order, um, denying the defendant's motion to suppress, um, relied on the factors that were not quite as subjective as that because that you're correct. Like people have rental cars, people go out of town to weddings, but it's the inferences and the totality. Do people go out of town in a rental car for a wedding and then have a deny having weapons and have ammunition in their vehicle nonetheless? Um, do you agree with your friend that the issue is whether or not there was reasonable suspicion at the time he exited the car? Cause it seems to me if, if that's the inquiry in this case, you got that, you have some difficulties. Uh, I thought the inquiry was whether he had reasonable suspicion to prolong the traffic stop. And a lot of things happen after Mr. Brooks enters the car. Aren't those the critical factors in this case? They are critical factors as well. Um, and the reason I was focusing so much on that as well, in the absence of them, I don't think you have reasonable suspicion to detain him, but once he gets in the car and this traffic check is going on and he's told you have a very dangerous offender there. And then later on, we have to get to the Miranda issue, I suppose. Mr. Brooks says, yes, I have a previous felony conviction. Now you've got something there, which added to the bullet and the other stuff may be reasonable suspicion, but I don't see how you have it before that. Well, the troopers reasonable suspicion for criminal activity, what the trial court found became particularized at the point you saw the ammunition, but it also continued to build thereafter to the point where he had probable cause of criminal activity when he learned that the defendant was a violent offender at that point and subsequently learned about the felony conviction. At that point, you have probable cause for a felon in possession of ammunition, a violation of 18 USC 922. So focus just on the violent offender, because I want to make sure I understand the sequence. As I understand the officer's testimony, it's that I learned very soon within a minute after we get in the car and he says, come to the car while I check, I do my, my check. I learned within a minute or two, he was a very violent offender or a violent offender. Is that the, is that correct? He learned shortly after the defendant got into the vehicle, that he requested the background check and the gave the dispatch, the defendant. Is there any more information here about who said that to him and what it was based on? I know later on, we find out that he has convictions, but at that point, what's the conversation? We don't have that on the tape. He had a dispatch call him. So when you watch the video, you hear him get a phone call, right? But we don't hear, we don't hear the words. That's correct. Yes. But the, the phone call was what he testified to was he didn't, there was a use caution warning with this individual. And he didn't want Mr. Brooks to hear that information over the radio. And so that occurs when the phone call occurs. That's my understanding. Okay. So we can follow that on the tape and figure out how long you can hear the phone ring. Yes. And that phone call was part of the initial background check that is done during every routine stop. When you're being detained for a traffic violation, right? That wasn't the secondary check. Was it? I'm not sure if that was part of the secondary checks or not. Your honor. He requested multiple, he requested a checkout of billings, which is where the defendant lives for warrants. He requested what's called an epic check. And he also gave the information to dispatch around the same time, just with the driver's license information. I thought your papers indicated that it was part of the, um, the initial, um, check that was made to dispatch that would be made routinely. But you don't know that it may not be. I would have to reread that part of the record. Your honor. I, would you, no, go ahead. Would you agree that, I'm curious in your response, um, would you agree that the video does not cooperate Trooper Moore's statements that the, um, that Brooks' brake lights were on or that Brooks was making large movements, uh, as Brooks approached? Um, regarding the movements on the video, I would agree they're not visible on the video. I think it's hard to see. And we conceded that as much in our brief. Um, and the court can also observe the Trooper get out of the car while he's observing the movement. So he's at a closer perspective. Um, and regarding the brake lights being on, we don't concede that the trial court found that they were, uh, or that the Trooper testified that they were, um, and what does the video show that? The video is unclear. Um, your honor, when I watched the video, um, at what the light is kind of the way the video, the light is shining, it's hard to see. Um, but the trial court did, um, take that testimony into consideration. Was the Trooper's testimony that the brake lights were still on after he got out of his, uh, vehicle, he, the Trooper and, um, and approached the car or was the testimony that the brake lights were still on after he had arrived at the, at the scene, they remained on for some period of time. If you know. Okay. Um, on page one on one of the excerpt of record, the Trooper, um, said the brake lights continued to be on and was concerned that the vehicle wasn't in park. Um, it's unclear to me whether that was when he got out of the vehicle or whether that was when he was still in his patrol vehicle, but that is in page one on one of the excerpt of record. And I know you're out of time, but I just wanted to ask one question on, on the Miranda, uh, because when Brooks was initially pulled over during the first couple of minutes of stop, it looks a lot like an arrest. Um, why wasn't a Brooks in custody for purpose of Miranda at that point? The court can look to the Berkmer versus McCarty case that we've cited in our brief, um, ordinary traffic stops, um, while they are a seizure under the fourth don't, um, constitute, um, custody for the purposes of Miranda. Um, and the trial court judge Christensen went through the factors of the Hayden case, United States versus Hayden and reaching its determination that he was not in custody. Part of the reason that, um, the Trooper's voice was so loud, which I'm imagining as part of the court's concern is the traffic stop immediately started with the Trooper using a loud voice. And normally that's not how it's done, um, to use that lot of volume is because the defendant's window was rolled down or rolled up and the trial court found, um, on pages 11 through 12 of the excerpt of record, um, and reaching its conclusion on that point, um, that, um, the Trooper needed to use an elevated volume to speak with the defendant. Um, but shortly after the Trooper learned there was no, um, firearm on the completely mellowed out. Um, and the trial court noted that as much, um, the Trooper was concerned about safety, um, but Mr. Brooks was never handcuffed. He was never placed in the backseat of the patrol car. Um, and the Trooper informed him that he asked everyone to come back to his car as part of, um, his traffic stops. And it was clear to Mr. Brooks that, um, that he would be free to go once his ticket was issued. The judge didn't make any findings about the taillights, did he? In the trial court's order. I'm looking at the order, not trying to find it. Did the judge make a finding that the tail, the brake lights remained on? Yes, he did. So he had a basis for that finding in the officer's testimony. Um, yes, Your Honor. Um, when he reached his conclusion about the Trooper having reasonable suspicion. Yeah, it's not in the facts. It's later on. That's what it was. It's on, um, pages 22 through 23 of the excerpt of record, um, where he reaches his conclusion about the Trooper having reasonable suspicion. And, um, at that point, um, he considers one of the factors to be the Trooper's testimony that the brake lights remained engaged. Thank you very much. Very much. I'll give you a couple of minutes for her. Thank you, Your Honor. Judge Hurwitz, in addressing your questions about when he found out, uh, when Mr. Brooks was a violent offender, the stop commenced at 8 15 in the morning. They, at 8 21, the Trooper Moore finally calls in the stop and that's when both of them are in the vehicle.   And at 8 27, so six minutes after they've entered the vehicle is when he gets information on the violent offender. Is that right? See, he says in his testimony, it happens within a couple of minutes and unfortunately it's not audible on the tape because it occurs on a phone call. Correct. Your Honor, the phone call appears to occur much sooner than that. There's a call history that the 911 dispatch center keeps. It's at excerpts of record 279. The times that I gave you are directly off their own record. Um, so we're at that point, 12 minutes into the stop when he has that. We know that he's getting it from the, that's my, that's the question that was asked to your, uh, friend. And that's what I think the question was asked. Do we know where he's getting the information from? In other words, we know there's a call to the information center six or eight minutes later, but do we know he appears within a couple of minutes of entering the car to be on his phone and his testimony seems to be, that's when I learned it. And so is there any evidence about who he was talking to after he enters the car? He was talking to his dispatcher. I believe he also may have talked to his partner that he called in. Um, and this information was received after he ran the secondary background checks. Judge Christensen doesn't find that. That's correct. I mean, and you see if I, and the, the, the record at least permits the finding that it occurred quite quickly after he got into the car, because that's what the officer testifies to. Uh, so why, why aren't we stuck with that as well? It's, it's in the record, Your Honor. And it was an exhibit at the suppression hearing, the exact times. Well, I understand that there was, there was a call at that exact time. To the people who kept records of calls. The question is, was there an earlier call to someone? And he does appear to be on the phone much earlier. I don't believe the record supports an earlier finding outside of what the call history shows. Um, now judge Staten to your question on why the exit order prolongs the stop. First, we know from Rodriguez that unrelated investigations to the traffic stop that prolong the stop are per se unreasonable under the fourth amendment. Immediately after Mr. Brooks was taken out of the vehicle. First, we have a search of the car, even before officer safety is addressed, even before Mr. Brooks is frisked, frisked, excuse me. Second, they get to the car and he immediately calls for backup. When you say they have the search, they have a search of the car. Um, he says he looked in the car. Is that when he looked in and saw the, the, um, what he thought was the spent shell casing, but which was the live ammunition? That's correct. Your Honor. He diverts his attention from Mr. Brooks, gets his flashlight out and visually inspects the car through the open door. Um, he next then calls in a partner and it is their policy that they cannot search a vehicle unless they have a partner present. A partner being called in is also abnormal for a traffic stop per troop remorse testimony. Then we immediately have the calling in of all the secondary background checks, the epic check, a local's check, a warrant's check. Um, again. So in terms of his getting information about the felony history of, um, uh, of your, of Mr. Brooks, was that one of the, wasn't that through the call that he made for registration and license check? He, he called in the stop and he called in the secondary checks at the same time. So whatever information starts coming back, there may be some information that is normal in traffic stop, but we also at the exact same time have the secondary checks that are wholly unrelated to the traffic stop. But if it's at the same time, do we count that? In other words, if he is entitled to make a call for registration and driver's license, and he has to wait for that response before, um, he ends the detention, before he issues the citation. If that doesn't add to the time. And while he's waiting, he also makes this other call. How does that affect in terms of prolonging in any way? That's what Rodriguez addressed, Your Honor. It says that even if you're diligently processing the traffic citation, that if you're prolonging the stop, we reject the argument that you're being diligent, which means you buy time to wait for this other information. But it has to prolong it past the time that a normal traffic inquiry would, would. That's correct. And Trooper Moore testified that removing someone from the vehicle prolongs the stop. But if that's part of a normal traffic stop for him, it wouldn't prolong it any longer than if he didn't have that any kind of subjective or, or, uh, other belief that he might have a secondary investigation if he does it every time. And it seems that the court credited him for this, then it has no effect on prolonging the invest, the detention. Respectfully, Your Honor. I would say it's an investigative tactic that he uses every time to put people in a closed environment to evaluate them. And I think that his, his norm is to prolong stop and violation. So another officer who ordinarily takes individuals back to the car during a, um, detention, there's no problem in doing that, but if subjectively you think, Hey, this is a good, this is a good tactic to put them at ease and maybe have them talk, if you have that subjective intention as well, then that changes it and it makes it, um, unlawful or it, it, then it counts against the prolonging standard. I believe it does count against the prolonging standard, Your Honor. Thank you very much. I appreciate both your presentations here today. Thank you very much. The case of United States versus Benjamin Brooks is submitted.
judges: Murguia, Hurwitz, Staton